**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

Malikah Shabazz, Sonya Harvey, Rosa Sanchez, and
Frank Taylor, *individually, and on behalf of all others similarly
situated*,

*Plaintiffs*,

v.

New York City Campaign Finance Board, Amy M.
Loprest, *solely in her official capacity, as the Executive Director
of the New York City Campaign Finance Board*, Hillary
Weisman, *solely in her official capacity as the General Counsel of
the New York City Campaign Finance Board,* and the City of
New York.

*Defendants.*

Docket No. 21-cv-3069

---

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

---

J. Remy Green
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com

Angel Cruz, Esq.
909 Sheridan Ave., Suite #4
Bronx, New York 10451

*Attorneys for Plaintiffs*

April 9, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................iii

PRELIMINARY STATEMENT.......................................................................................1

FACTUAL HISTORY ....................................................................................................1

ARGUMENT..................................................................................................................2

    I.    Plaintiffs Should Receive an Injunction to Restore the Status Quo...........................2

    II.    Plaintiffs' Claims Will Succeed on the Merits. ........................................................4

        A.    The restrictions here require strict scrutiny.........................................................5

           i.    Because Local Law No. 15 changed ballot access rules in the middle of an election it is a severe burden.........................................................................................5

           ii.    The retroactivity impact of Local Law No. 15 is a severe burden on associational rights...........................................................................................7

           iii.    Local Law No. 15 similarly poses equal protection problems. .........................8

        B.    If not strict scrutiny, the restrictions here require analysis on the high end of *Anderson-Burdick*'s sliding scale. ..................................................................................10

        C.    Under any level of scrutiny, the restrictions are not supported by any cognizable justification...................................................................................................11

        D.    The restrictions also pose due process problems..............................................13

        E.    Plaintiffs are also likely to prevail because Local Law No. 15 is inconsistent with State law…......................................................................................................15

III.    The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is Presumed. 16

CONCLUSION.................................................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
    460 U.S. 780, 789 (1983) ..................................................................................................... 11

*Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders,*
    112 F.3d 652 (3d Cir. 1997) ................................................................................................ 13

*Ayers-Schaffner v. Distefano,*
    37 F.3d 726 (1st Cir. 1994) .................................................................................................. 6

*Briscoe v. Kusper,*
    435 F.2d 1046 (7th Cir. 1970) ............................................................................................. 6

*Burdick v. Takushi,*
    504 U.S. 428, 434 (1992) ..................................................................................................... 4

*Cohen v Bd. of Appeals,*
    100 NY2d 395 (2003) ......................................................................................................... 14

*Credico v. N.Y. State Bd. of Elections,*
    751 F. Supp. 2d 417 (E.D.N.Y. 2010) .......................................................................... 11, 16

*Credico v. New York State Bd. Of Elections,*
    2013 US Dist. LEXIS 109737 (EDNY 2013), 10-cv-4555-(RJD)-(CLP) ..................... 7, 11

*Culp v. Raoul,*
    921 F.3d 646 (7th Cir. 2019) .............................................................................................. 13

*Daunt v. Benson,*
    956 F.3d 396 (6th Cir. 2020) (Readler, J., concurring) ....................................................... 9

*Farrell v. Bd. Of Elections in NY,*
    1985 US Dist LEXIS 16669 (SDNY Aug. 20, 1985), No. 85-Civ-6099 (JES) .................. 13

*Gallagher v NY State Bd. of Elections,*
    477 F Supp 3d 19 ................................................................................................................. 3

*Green Party v. N.Y. State Bd. of Elections,*
    389 F.3d 411 (2d Cir. 2004) ........................................................................................*passim*

*Green Party v Weiner,*
    216 F. Supp. 2d 176 (SDNY 2002) ..................................................................................... 9

*Green v DiNapoli,*
   96 NY2d 910 (2001) ................................................................................................ 14

*Hirschfeld v. Bd. of Elections,*
   799 F. Supp. 394 (S.D.N.Y. 1992) ........................................................................... 13

*Hudler v. Austin,*
   419 F. Supp. 1002 (ED Mich. 1976), *aff'd sub. nom., Allen v. Austin,* 430 U.S. 924
   (1977) ........................................................................................................................ 6

*Jones v United States Postal Serv.,*
   488 F Supp 3d 103 (SDNY 2020) ............................................................................ 12

*Kennedy v. Mendoza-Martinez,*
   372 U.S. 144 (1963) ................................................................................................... 8

*Kermani v. N.Y. State Bd. of Elections,*
   487 F. Supp. 2d 101 (NDNY 2006) ......................................................................... 15

*Lerman v. Bd. Of Elections,*
   232 F3d 135 (2d Cir. 2000) ...................................................................................... 11

*Libertarian Party of Ohio v. Husted,*
   2014 U.S. Dist. LEXIS 187771 (SD Ohio, 2014) ...................................................... 6

*Lichtman v. Office of Personnel Management,*
   785 F.2d 299 (Fed. Cir. 1988) ................................................................................. 14

*Lynch v. City of New York,*
   589 F.3d 94 (2d Cir. 2009) ........................................................................................ 3

*Medina v. City of Osawatomie,*
   992 F Supp 1269 (D Kan 1998) ................................................................................. 4

*Ne. Ohio Coal. v. Husted,*
   696 F.3d 580 (6th Cir. 2012) ..................................................................................... 6

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) ..................................................................................... 4

*Obama for Am. v. Husted,*
   697 F3d 423 (6th Cir. 2012) ...................................................................................... 4

*Patriot Party v. Allegheny Cty. Dep't of Elections,*
   Nos. 96-3677 and 97-3359, 1998 U.S. App. LEXIS 12688 (3d Cir. June 15, 1998) ......... 8

*Pitts v. Black,*
   608 F. Supp. 696 (SDNY 1984) ............................................................................... 16

*Poindexter v. Strach,*
    324 F. Supp. 3d 625 (E.D.N.C. 2018).................................................................1, 6

*Price v. N.Y. State Bd. of Elections,*
    540 F.3d 101 (2d Cir. 2008)...........................................................................4, 11

*Price v NY State Bd. of Elections,*
    540 F3d 101 (2nd Cir. 2008).................................................................................5

*Richardson v Hughs,*
    978 F3d 220 (5th Cir 2020)................................................................................14

*Rutan v. Republican Party,*
    497 U.S. 62 (1990)............................................................................................10

*Schulz v. Williams,*
    44 F.3d 48 (2d Cir. 1994)..............................................................................3, 15

*Smith v. Doe,*
    538 U.S. 84 (2002).............................................................................................8

*Stanley v. Illinois,*
    405 U.S. 645 (1972)..........................................................................................13

*Storer v. Brown,*
    415 U.S. 724 (1974)..........................................................................................10

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994)..........................................................................................11

*Vanasco v. Schwartz,*
    401 F. Supp. 87 (SDNY 1975), *aff'd* 1976 U.S. LEXIS 921 (1976)...............16

*Wholesale Laundry Bd. of Trade, Inc. v New York,*
    17 AD2d 327 (1st Dept 1962)......................................................................14, 15

*Williams v. Salerno,*
    792 F.2d 323 (2d Cir. 1986)..........................................................................3, 16

*Yang v Kellner,*
    458 F Supp 3d 199 (SDNY 2020) ................................................................3, 11

*Yang v. Kosinski,*
    960 F3d 119 (2d Cir. 2020).........................................................................*passim*

**Statutes**

Local Law No. 15.........................................................................................*passim*

Pub. Off. L. § 3 ...............................................................................................................15

**Other Authorities**

Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ............................3

Newberg on Class Actions § 24:83 (4th ed. 2002) .......................................................3

Shane Goldmacher, <u>New York's Leadership Is Mostly White. That's Roiling the</u>
    <u>Speaker's Race</u>, NY TIMES (Nov. 7, 2017). ......................................................10

U.S. Const., amend. I.................................................................................................*passim*

U.S. Const. amend. XIV ............................................................................................4, 9

## PRELIMINARY STATEMENT

This case presents a straightforward Constitutional question:  can the City Council change the rules of engagement in the middle of a campaign, targeting exactly one candidate and his donors?  Perhaps unsurprisingly, there is not "any legislation that has been found constitutionally sound when enacted during an election cycle that disqualifies previously qualifying candidates from appearing on a ballot." *Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (E.D.N.C. 2018).

This is for good reason — voters, candidates, and the government itself all rely on the rules continuing to be the rules.  New York has a uniquely arcane system of election law, and to allow it to shift completely in the middle of an election essentially allows legislative bodies to dictate the results of elections.  And maybe just as importantly, the specific measures here, as applied by the Campaign Finance Board ("CFB"), have a quantifiable effect on specific voters:  those voters' voices are worth exactly one ninth as much as any other voter this cycle.  The Constitution calls for better than that.

So for Plaintiffs — and those others who donated with the expectation of having their funds matched by the CFB — the Court should ensure that matching funds issue the way everyone expected them to before the City Council changed the rules in late February.

## FACTUAL HISTORY

While a more detailed version of the facts here is in the Complaint ("Comp."), the basic situation here is simple.  Defendants administer New York City's "landmark" campaign finance system.  Comp. ¶ 25.  That serves to "provide candidates with a strong incentive to finance their campaigns by engaging with average New Yorkers instead of seeking large contributions from special interests." *Id.*  It does so by matching — up to $175.00 — each dollar donated by people like

Plaintiffs at a rate of $8-to-$1.  Comp. ¶¶ 1; 40.  That system allows average New Yorkers — like Plaintiffs and the putative class[1] — to have their voice heard in local elections.

The City Council races have been underway for some time.  With primary elections scheduled for June 22, candidates have been campaigning since last year, and large organizations have been blessing candidates with their endorsements since at least December of last year.[2] Candidate Hiram Monserrate has been running since December.  Comp. ¶¶ 31-39.  Monserrate has received a total of $18,070 in donations, including donations from each individual Plaintiff.  *Id.* ¶¶ 37; 12-23.  *See also*, Shabazz Dec. ¶ 3; Harvey Dec. ¶ 3; Sanchez Dec. ¶ 3; Taylor Dec. ¶ 3.  Plaintiffs' donations were all made in January 2021 and December 2020.  *Id.*  And the total donations of the putative class are likely to entitle the Monserrate campaign to matching funds of somewhere north of $100,000.00.  Comp. ¶ 41.

Yet, in late February of this year, Mayor De Blasio signed a local law — Local Law No. 15 — passed by the City Council that has literally a single, practical effect:  eliminating Hiram Monserrate from the ballot.  Comp. ¶¶ 43; 47; 50-52.  Then, in mid-March, Defendants refused to match funds Plaintiffs and the putative class donated.  *Id.* ¶¶ 44-46.

This action and motion followed.

## ARGUMENT

**I.    Plaintiffs Should Receive an Injunction to Restore the Status Quo.**

"In general, the district court may grant a preliminary injunction if the moving party establishes (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b)

---

[1] The putative class here is the 282 people entitled to have their donations to Monserrate matched by Defendants.

[2] *See, e.g.*, https://jimowles.org/news/press-release-jim-owles-liberal-democratic-club-announces-first-round-of-endorsements-in-2021-nyc-races (endorsements announced Dec. 21, 2020); https://www.nycclc.org/press-release/2021-02/nyc-central-labor-council-announces-second-round-2021-endorsements (AFL-CIO endorsements announced Feb. 16, 2021); https://twitter.com/nypanasiandems/status/1355590067453104133 (NY Pan-Asian Democratic Club endorsements announced Jan. 30, 2021).

sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus [(3)] a balance of the hardships tipping decidedly in favor of the moving party." *Lynch v. City of New York*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted). Here, given that the enactment of Local Law No. 15 disrupted the status quo — and any harm to the CFB could be remedied after litigation by a return of matching funds by the Monserrate campaign — Plaintiffs need only meet the test for a prohibitory injunction.

As discussed in more depth below, in cases about the right to vote or access to the ballot, the injunction test largely collapses into a single question of whether the alleged act is unconstitutional (particularly when there are few real factual disputes, as is true here). *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). That is, an injunction requires a showing of "(a) irreparable harm and (b) likelihood of success on the merits." *Id.* But voters "would certainly suffer irreparable harm if their right to vote were impinged upon." *Id.* And so, an "injunction [is] properly issued [in a voting rights case] if the district court" finds a probability of success on the constitutional question. *Id.*

Put more simply: the showing of probability of success on the merits entails "[t]he typical remedy" of an injunction. *Schulz*, 44 F.3d at 61 ("permanent injunction was not an abuse of discretion, as it represented appropriate relief" for an unconstitutional restriction of access to the ballot). Ultimately, then, if the Court finds that Plaintiffs — on behalf of the putative class[3] — have made their clear showing of probability of success on the Constitutional questions, the balance of the equities is all but automatically tipped in their favor by the "'strong interest in exercising the fundamental political right to vote'" and fact that "[t]he public interest … favors permitting as many

---

[3] "The Court need not formally certify a class in order to issue the requested preliminary relief." *Yang v Kellner*, 458 F Supp 3d 199, 218, n 5 (SDNY 2020), *citing* Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief.") *and* Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed. 1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."). *See also, Gallagher v NY State Bd. of Elections*, 477 F Supp 3d 19, 38-39; 38 n. 2 (SDNY 2020) (same).

qualified voters to vote as possible." *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012), *quoting Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

## II.    Plaintiffs' Claims Will Succeed on the Merits.

When a case "call[s] upon" the Court "to consider the constitutionality of [an election restriction] as applied[,] … [t]here is no 'litmus-paper test' to answer th[e] question" of constitutionality. *Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (cleaned up), *quoting Anderson v. Celebrezze*, 460 U.S. 780, 789, (1983). Rather, the Court "conduct[s] a two-step inquiry that applies to election-related restrictions." *Id.*

"First, [the Court] ascertain[s] the extent to which the challenged restriction burdens the exercise of the speech and associational rights at stake[:] The restriction could qualify as 'reasonable [and] nondiscriminatory' or as 'severe.'" *Id*, *quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Second, the Court applies scrutiny: a restriction is subject to the "*Anderson-Burdick* balancing test"[4] if the restriction is reasonable and nondiscriminatory and to "the more familiar test of 'strict scrutiny'" if the restriction is severe. *Id. See also*, *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) ("[t]he standards for review are clear[:] If the plaintiffs' rights are severely burdened, the statute is subject to strict scrutiny. If the burden is minor, but non-trivial, *Burdick's* balancing test is applied."); *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004).[5]

---

[4] The *Anderson-Burdick* test, discussed below, provides that the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate, and then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment under this more flexible standard, [the Court] must determine both the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights." *Yang*, 960 F.3d at 129 (alterations adopted).

[5] Some courts (outside this Circuit) have theorized that neither strict scrutiny nor rational basis exists in *Anderson-Burdick* jurisprudence, but that the flexible *Anderson-Burdick* balancing test may bend to "approximat[e]" both standards. *See, e.g., Medina v. City of Osawatomie*, 992 F Supp 1269, 1275 (D Kan 1998). *See also, Obama for Am. v. Husted*, 697 F3d 423, 440 (6th Cir. 2012) (White, J., concurring in part, dissenting in part) ("*Anderson-Burdick* balancing test … is flexible enough to *approximate* the rational-basis test when appropriate, i.e., where the burden is slight, the required showing by the state is correspondingly light.") (emphasis added). This Second Circuit, however, seems to have foreclosed this alternative approach with some finality in *Yang*.

Under either level of review, as applied, the effect of an arbitrary change in rules of ballot access in the middle of an election is unconstitutional — and profoundly harms voters. And ultimately, the Court may effectively skip the first stage of analysis (determining the burden/level of scrutiny) given the lack of cognizable government interest. *Yang*, 960 F.3d at 129 ("in these circumstances, we need not decide whether the strict-scrutiny test applies here, since Plaintiffs … are clearly or substantially likely to prevail on the merits of their claim even under the more flexible and less exacting standard").

A.      The restrictions here require strict scrutiny.

The burden stage of *Anderson-Burdick* asks whether restrictions are reasonable and nondiscriminatory on one hand, or severe on the other. The burden here is severe more generally — but is indisputably severe as applied to an ongoing election, changing the rules midstream. "The voter-plaintiffs have an associational right to vote in political party elections, and that right is burdened when the state makes it more difficult for these voters to cast ballots. Similarly, candidates' associational rights are affected, in at least some manner, when barriers are placed before the voters that would elect these candidates to party positions. And it is well-established that a political party's associational rights are affected when the party's nomination process, and its mechanisms for selecting internal leaders, are disrupted by state action." *Price v NY State Bd. of Elections*, 540 F3d 101, 108 (2d Cir. 2008) (cleaned up).

i.   *Because Local Law No. 15 changed ballot access rules in the middle of an election it is a severe burden.*

Before Local Law No. 15, people convicted of — on a guilty plea or otherwise — the listed felonies had no restrictions on entering public service. Local Law No. 15 was enacted on Feb. 25, 2021, in the middle of this election, changing the rules midcycle. Now, candidates previously convicted of certain crimes cannot "hold" certain offices in New York City. Thus, the as-applied restriction here falls into the category of "legislation … enacted during an election cycle," which

receives heightened scrutiny, and all but never pass muster.  *Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (E.D.N.C. 2018).

As the Second Circuit held in *Yang*, "application of [a mid-election-cycle change in law] in 2024 may raise different issues that are not implicated in the circumstances presented" when it is challenged in that initial election cycle:  a law that poses a trivial burden when on the books four years in advance can still pose a severe burden when passed in and applied to an ongoing election. 960 F.3d at 129.  In other words, when there is a mid-cycle change in law, "[t]he long line of cases upholding ballot access requirements are patently inapplicable, as limiting candidates through reasonable advance requirements provides no justification for the retroactive restriction of the right to vote" and that is harm of an "obviously severe nature." *Ayers-Schaffner v. Distefano*, 37 F.3d 726, 730 (1st Cir. 1994).  *See also, Poindexter v. Strach*, 324 F. Supp. 3d 625, 632 (E.D.N.C. 2018) ("the court [is not] aware, of any legislation that has been found constitutionally sound when enacted <u>during an election cycle</u> that disqualifies previously qualifying candidates from appearing on a ballot") (emphasis in original); *Libertarian Party of Ohio v. Husted,* 2014 U.S. Dist. LEXIS 187771 (SD Ohio, 2014); *Hudler v. Austin,* 419 F. Supp. 1002 (ED Mich. 1976), *aff'd sub. nom., Allen v. Austin,* 430 U.S. 924 (1977); *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir. 1970).  *Cf. Ne. Ohio Coal. v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012) ("substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution'"), *quoting Griffin v. Burns*, 570 F.2d 1065, 1074 (1st Cir. 1978).

The rule might be summed up this way:  any change in the way elections are administered, if applied in the middle of an election cycle, poses a "severe" burden (requiring strict scrutiny) when applied to that same election cycle.  As a policy matter, this rule makes sense.  While a change in ballot access rules might not pose a significant burden should voters and candidates have time to adapt their behavior, without that time it is a "different issue[]" entirely. *Yang*, 960 F.3d at 129.

6

To that end, consider the time and effort involved in campaigning for office.  Candidates decide whether to seek office long before an election.  And indeed, organizations began issuing *endorsements* as early as December last year.  So if a candidate is knocked off the ballot by a changed rule long into the race, the political constituency they represent will likely ultimately be unrepresented.  *See* Comp. ¶ 35.  That is, potential candidates evaluate the existing field before they make decision to run.  If they politically align with a candidate already running, they are less likely to enter the race.  And at the point at which Local Law No. 15 was passed, it was *far* too late for a new candidate to step into Monserrate's shoes to represent his constituency (including Plaintiffs and the putative class).  Similarly, Plaintiffs and the putative class had already made their donations — with a vested expectation of matching funds — to the Monserrate campaign.  When those donations were made, there was no way for Plaintiffs or the class to know that they risked their voices not receiving the "landmark" amplification provided by New York City law.

By contrast, imagine the Local Law No. 15 applying prospectively:  Monserrate would not have put his name in the ring.  Instead, someone else would fill the same political niche.  And donors would have fair warning that — if they donated to a candidate possibly barred by Local Law No. 15 — their donations might not be matched.  So, such donors could evaluate risks fairly — as could candidates.  But passing a law months into a campaign cycle disrupts *everyone's* expectations.

Thus, Local Law No. 15 poses a severe burden as applied by the CFB this cycle.

> ii. *The retroactivity impact of Local Law No. 15, as well as the burden as applied, is severe burden.*

Local Law No. 15 also places a different severe burden on Plaintiffs in its retroactivity. Monseratte pled guilty to a crime in 2012.  Comp. ¶ 47.  In that plea, he was not offered any allocution or warning that his plea might bar him from office — because, of course, no such restriction existed then.  *Id.*  And adding, essentially, a *new* criminal penalty to an old offense, after a person has already served their sentence, in a law that literally only applies to one person raises

serious Constitutional concerns.[6]  While Plaintiffs cannot raise those concerns directly, the targeted

nature of the law implicates Plaintiffs' right of association.  *Cf. Green Party v. N.Y. State Bd. of Elections*,

389 F.3d 411, 419-20 (2d Cir. 2004) ("if state law grants established parties a decided advantage over

any new parties struggling for existence and thus places substantially unequal burdens on both the

right to vote and the right to associate the Constitution has been violated"); *Patriot Party v. Allegheny

Cty. Dep't of Elections*, Nos. 96-3677 and 97-3359, 1998 U.S. App. LEXIS 12688, at *2 (3d Cir. June

15, 1998).

　　　　Here, Plaintiffs are being punished, in a retroactive way, for their association with

Monserrate.  And that punishment is piled on to an already existing conviction — with no warning

during the plea that such consequences could follow.  Yet, every New Yorker who donated to *any*

other candidate eligible to for matching funds prior to Local Law No. 15 will have their donations

matched.  And the *only* candidate made ineligible for funds by Local Law No. 15 is Monserrate.

Indeed, the collection of felonies in Local Law No. 15 appears to have been selected to specifically

pick out Monserrate — and thus severely burdens the voices of those who associate with him.

　　　　Finally, perhaps unlike most other *Anderson-Burdick* cases, the burden on Plaintiffs' right of

association is easy to quantify:  their voices are exactly one ninth as powerful as those of other New

Yorkers.  That is — without a doubt — a severe burden.

　　　　　　　*iii.   Local Law No. 15 similarly poses equal protection problems.*

　　　　For reasons very similar to the those discussed in the previous section, Local Law No. 15

also flouts the Equal Protection Clause.

---

[6] The matter might be considered a bill of attainder or a violation of the *ex post facto* clause from Monserrate's perspective.  The question in such cases is, at base, whether a particular measure amounts to an additional "punishment" for the offense.  *See Smith v. Doe,* 538 U.S. 84 (2002).  The multi-factor test for evaluating whether a measure is punitive is set out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963).  If barring Monserrate from office is properly considered punitive, doing so retroactively — without, as the New York State Court System suggests, "[his] lawyer … tell[ing] him about the collateral consequences that come with any conviction" (*see* https://www.nycourts.gov/courthelp/criminal/collateralConsequencesBasics.shtml) — would be Constitutionally impermissible.

In *Anderson-Burdick* cases, some Courts have suggested that because the Supreme Court has suggested the intermediate scrutiny applies only to "nondiscriminatory" restrictions, "in the Equal Protection setting, we would be wise to forego *Anderson-Burdick*." *Daunt v. Benson*, 956 F.3d 396, 423 (6th Cir. 2020) (noting "[t]he temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed" and "we recently questioned 'whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims,' as the Supreme Court has 'only applied the framework in the context of generally applicable laws.'") (Readler, J., concurring), *quoting Mays v. LaRose*, 951 F.3d 775, 783 n.4 (6th Cir. 2020).  That said, in a 2004 case, the Second Circuit seemed to treat instances of unequal treatment as an independent strict scrutiny trigger *within* the *Anderson-Burdick* framework, reasoning that an unequal treatment made a minor political party's "situation even more difficult" and therefore made the "burden" a "severe" one.  *Green Party v. N.Y. State Bd. of Elections*, 389 F.3d 411, 419-22 (2d Cir. 2004).

Still, whatever the mode of conceptualizing equal protection issues, Local Law No. 15 poses equal protection problems.  First, "[a]n otherwise permissible law might still violate the Equal Protection Clause if there is evidence of an intentional or purposeful deprivation of the right to vote." *Green Party v Weiner*, 216 F. Supp. 2d 176, 188 (SDNY 2002), *citing Rogers v. Lodge*, 458 U.S. 613, 621 (1982).  Here, there is strong evidence — including simply that the law has *only* applied to Monserrate — that the purpose of Local Law No. 15 was to knock Monserrate off the ballot *this* session.  And as applied here, that means that the measure treats Plaintiffs and the putative class differently than any other donor.  This line of authority begins from the touchpoint that the government "may not enact a regulation providing that no Republican … shall be appointed to federal office" and "[w]hat the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly," a intentional attempt to discard Democratic-leaning votes is facially unconstitutional.  *Rutan v. Republican Party*, 497 U.S. 62,

77-78 (1990), *quoting Pub. Workers v. Mitchell*, 330 U.S. 75, 100 (1947).  So here, the City Council cannot enact a law that states that — in a two person race — one person cannot run.  That is simply "accomplishing indirectly" what the legislature could not do directly:  declare the winner of Monserrate's City Council race.

There also appear to be troubling racial overtones to the law — to the limited extent it is not laser-focused on Monserrate.  Of what appear to be 24 total New York City politicians[7] — based on publicly available sources — who have historically been convicted of qualifying offences, 18 are Black or Latino, while only 6 are white.  *See*, Addendum, *post* at 18.  That ratio is far, far different than the ratio of Black and Latino to white politicians occupying City office, both currently and historically.  *See generally,* Shane Goldmacher, New York's Leadership Is Mostly White. That's Roiling the Speaker's Race, NY TIMES (Nov. 7, 2017).  And a racial disparity of this size calls for heightened scrutiny.

In short, Plaintiffs and the putative class are being treated differently than any other voter-donors, because of their exercise of associational rights.  That is, the CFB treats Plaintiffs' speech differently than that of their fellow New Yorkers because of *who* they support and associate with.  And that triggers strict scrutiny.

> **B.**  If not strict scrutiny, the restrictions here require analysis on the high end of *Anderson-Burdick*'s sliding scale.

When it comes to burdens on the right to vote, the Second Circuit and the Supreme Court alike have cautioned that there "is no litmus-paper test for separating those restrictions that are valid from those that are invidious" and the "rule is not self-executing and [it] is no substitute for the hard judgments that must be made."  *Storer v. Brown*, 415 U.S. 724, 730 (1974).  *See also, Yang*, 960 F.3d at

---

[7] This includes politicians who the law, because of their statewide office, does not apply to.

129, *quoting Anderson*, 460 U.S. at 789.  And, of course, the "results of this evaluation [cannot] be automatic."  *Anderson*, 460 U.S. at 789.

If a burden is not necessarily "severe," but still is a "weighty imposition on Plaintiffs' … right[s]," *Anderson-Burdick*'s sliding scale requires much more than rational basis review.  *Yang*, 458 F Supp 3d at 214.  As Chief Judge Dearie explained in *Credico*:

> "That the plaintiffs' associational rights will not be severely burdened, however, does not end my inquiry. As the Second Circuit recently instructed in *Price*, while 'review in such circumstances will be quite deferential,' I must actually "weigh the burdens imposed on the plaintiff against the *precise* interests put forward by the State" and 'take into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights,' *Price* directs me to conduct more than just a rational basis review, and I am not to give much weight to 'flimsy' or 'extraordinarily weak' justifications proffered by the State."

*Credico v. N.Y. State Bd. of Elections*, 751 F. Supp. 2d 417, 422 (E.D.N.Y. 2010) (citations omitted, emphasis added in *Credico*), *citing Price*, 540 F.3d at 108-11.

As explained above, even assuming the burden is not severe (it is), blocking Plaintiffs and the putative class from receiving the amplification that every other voter's donations will receive is – at a minimum – a "weighty imposition."  *Anderson-Burdick* requires such an imposition to be balanced by real and precise justifications.  As explained below, the CFB cannot present such justifications here.

> C.        Under any level of scrutiny, the restrictions are not supported by any cognizable justification.

Once a plaintiff shows a burden on the right of access to the ballot – even if that "burden … is not large" – it becomes the State's responsibility to justify that burden.  *Price*, 540 F.3d at 112.  The Court should weigh "the precise interests *put forward by the State as justifications* for the burden imposed by its rule."  *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (emphasis added).  *See also, Green Party v. NY State Bd. of Elections*, 389 F3d 411, 421 (2d Cir. 2004), *Lerman v. Bd. of Elections*, 232 F3d 135, 149 (2d Cir. 2000); *and Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).  Moreover, the mere "fact

that the defendants' asserted interests are 'important in the abstract' does not necessarily mean that its chosen means of regulation 'will in fact advance those interests.'" *Green Party* at 421, *quoting Lerman* at 149-50 ("we cannot uphold a statutory provision that substantially burdens political speech and association … without insisting that the defendants do more than simply posit the existence of the disease sought to be cured.") (cleaned up).

In analyzing the justification, the Court should "examine each justification in turn and consider whether they make it necessary to burden the constitutional rights of Plaintiffs." *Yang*, 960 F.3d at 134 (cleaned up), *citing Anderson*, 460 U.S. at 789.  The measure chosen by the State here, under any level of scrutiny, fails to "in fact advance [its proffered] interests." *Id.*  When the restriction enacted fails to balance against the burden it poses, the restriction is unconstitutional.

The likely government interest here is "certainly important" in the abstract (*Yang v Kosinski*, 960 F3d 119, 127 [2d Cir. 2020]; *Green Party* at 421) — Defendants will likely characterize it as something like "ensuring New Yorkers can trust their government."  But the measure employed fails to "in fact" advance that end.  *Green Party* at 421.  Recall that the *sole* subject of the law (at least this cycle) is Hiram Monserrate.  Monserrate has been — with voters' full knowledge of his convictions — already elected to public office.  There is no question that voters understand Monserrate's past.  So rather than preventing some kind of fraud on the voters, being accomplished by subterfuge, Local Law No. 15 simply suggests the voters cannot make a decision for themselves on this matter. *That* is not a legitimate government interest.

Similarly, it is hard to see how a government interest — at least as applied — is advanced at all by refusing to match Plaintiffs' donations.  "Increases in the cost of administering the election system [are] not a sufficient basis here for infringing [Plaintiffs'] First Amendment rights." *Jones v United States Postal Serv.*, 488 F Supp 3d 103 (SDNY 2020), *citing Tashjian v Republican Party*, 479 US 208, 218 (1986).  Whatever the benefits might be of preventing Monserrate from taking office

(which is what the law seems to actually contemplate, *see* Comp. ¶¶ 74-84), preventing Plaintiffs' donations from being matched as the law *required* when the donations were made does not serve the same function. That is, the only state interest in refusing to match Plaintiffs' donations is money — and money alone does not justify a constitutional burden. Rather, "the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general … that [it was] designed to protect the fragile values of a vulnerable citizenry from the **overbearing concern for efficiency and efficacy** that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972) (emphasis added). *See also Culp v. Raoul*, 921 F.3d 646, 661 (7th Cir. 2019) ("simply avoiding cost and administrative burden does not justify denying constitutional rights"); *Atl. Coast Demolition & Recycling v. Bd. of Chosen Freeholders*, 112 F.3d 652, 671 (3d Cir. 1997) ("defendants' financial problems could not constitute the 'compelling reason' for delaying a remedy"). And, indeed, the cost of matching Plaintiffs' donations is the City "chose to bear … when it assumed the responsibility" of administering the matching fund system – and induced voter reliance on that system. *Yang*, 960 F.3d at 136.

In short, particularly for campaign contributions made prior to Local Law No. 15 being in force, there *is* no government interest in not matching donations. Citizens spoke, incentivized by a system the government promised them would work. And the government cannot simply slip out of that promise based on a later-passed law.

      D.        The restrictions also pose due process problems.

Just as, "[w]hen a candidate relies on the Board of Elections for procedural guidance, that candidate may have a viable due process claim if he is excluded from the ballot because of errors resulting from his reasonable reliance on the Board," a voter relying on the state of the law has their due process rights violated when the law is changed midstream. *Farrell v. Bd. Of Elections in NY*, 1985

US Dist LEXIS 16669, at *5, n 1 (SDNY Aug. 20, 1985), No. 85-Civ-6099 (JES).  *See also, Hirschfeld v. Bd. of Elections*, 799 F. Supp. 394, 395 (S.D.N.Y. 1992) ("plaintiff handed his present petitions to the clerk who accepted them. He then asked the clerk whether there were any further formalities expected of him, and was told that there were none. There were no facts known to plaintiff Hirschfeld which could have lead him to suspect that the information which he had received was inaccurate.").  And similarly, courts have long excused errors introduced in the voting process, that technically would render some document as having "a fatal defect," where those errors are created by the Board of Elections.  *Green v DiNapoli*, 96 NY2d 910, 912 (2001).  *Cf. Lichtman v. Office of Pers. Management*, 785 F.2d 299 (Fed. Cir. 1988) ("we think it clear that Congress intended to protect the equitable rights of a federal employee in a case (such as the current one) in which he was inequitably deprived of his benefits by the Government's own error").

While analysis of this claim, best read, likely folds into Plaintiffs' equal protection claims, precedent on this point is murky.  *See, e.g.*, *Richardson v Hughs*, 978 F3d 220, 235 (5th Cir. 2020) ("analyz[ing] the equal protection and due process claims together," and observing that though "differences could potentially warrant separate *Anderson/Burdick* analyses, the district court applied the same analysis to both claims") (cleaned up); *cf. Daunt v. Benson*, 956 F3d 396, 423 (6th Cir. 2020) ("[t]he temptation to overindulge in the *Anderson-Burdick* test has not gone unnoticed" and "we recently questioned 'whether the Supreme Court ever intended *Anderson-Burdick* to apply to Equal Protection claims'").  But as a matter of due process alone, it would be fundamentally unfair for the CFB to refuse to match funds donated before Local Law 15 was even passed — let alone signed — because the voters had a well-settled expectation of receiving $8-to-$1 fund matching.

E.       Plaintiffs are also likely to prevail because Local Law No. 15 is inconsistent with State law.

Even outside the Constitutional issues, "local laws that are inconsistent with state laws are generally invalid." *Cohen v Bd. of Appeals*, 100 NY2d 395, 399 (2003).  The New York Court of Appeals has framed this as a kind of field preemption:

> "The Legislature may expressly state its intent to preempt, or that intent may be implied from the nature of the subject matter being regulated as well as the scope and purpose of the state legislative scheme, including the need for statewide uniformity in a particular area. A comprehensive and detailed statutory scheme may be evidence of the Legislature's intent to preempt."

*Id.* at 400.  Here, Local Law No. 15 is preempted by a state law that sets forth a "comprehensive and detailed statutory scheme."  *Id.  See also, Wholesale Laundry Bd. of Trade, Inc. v New York*, 17 AD2d 327, 329 (1st Dept 1962).  *See,* Pub. Off. L. § 3 (a statewide scheme for criminal bars and restrictions on holding office).  To be sure, merely covering similar topics does not make laws "inconsistent" in the relevant sense.  But where a state law covers the field, it bars local management.

On this, consider Public Officers Law § 3.  That section serves an identical function to Local Law No. 15:  it sets out a curated list of crimes, and the consequences that a conviction relating to those crimes will have on a person's ability to hold public office.  And showing an intent to preempt the field, the law even provides specific requirements related to certain offices "in the city of New York," as well as in many other municipalities.  That is, "the State law indicates a purpose to occupy the entire field" by specifying rules for local municipalities.  *Wholesale Laundry Bd. of Trade, Inc. v New York*, 17 AD2d 327, 330 (1st Dept 1962).  It thus "indicates a general State policy to make the provisions of that law free from interference by local authorities."  *Id.*

III.    **The Balance of the Equities Favors Injunctive Relief and Irreparable Harm is**
        **Presumed.**

        In ordinary cases, the grant or denial of an injunction may turn on factors beyond likelihood

of victory on the merits.  In constitutional cases, however, a demonstration of the required

likelihood of success entitles a party to a presumption that the equities balance in their favor.  "That

is, "[t]he typical remedy afforded when a statute is found to be facially unconstitutional is an

injunction enjoining its enforcement."  *Schulz v. Williams,* 44 F.3d 48 (2d Cir. 1994) (provision of

voters lists only to major parties was denial of equal protection to minority parties).  This rule holds

particular weight in the election context:  "[i]n matters involving allegations or claims of First

Amendment violations, irreparable harm may be presumed."  *Kermani v. N.Y. State Bd. of Elections,*

487 F. Supp. 2d 101 (NDNY 2006) (injunction granted against enforcement of Election Law section

restricting outside expenditures in primary elections).  That is, because of the nature of elections, in

this kind of case, "absent injunctive relief, [Plaintiffs'] First Amendment rights likely would be

forever extinguished."  *Yang,* 960 F.3d at 136 (2d Cir. 2020) (holding that extinguishing voting rights

is "surely a 'significant' hardship that the Board has not adequately justified" and any costs to the

State are a "cost that the State of New York chose to bear when it assumed the responsibility of

regulating and holding the Democratic Party's primary election.") (alterations adopted).

        Thus, injunctions issue in virtually every case to find a likelihood of success on a

constitutional claim under *Anderson-Burdick* (and its predecessors).  *See, e.g., Green Party v. N.Y. State*

*Bd. of Elections,* 389 F.3d 411 (2d Cir. 2004) (injunction granted against Election Law section

canceling status of previously enrolled parties which fail to get 50,000 votes in gubernatorial

election); *Williams v. Salerno,* 792 F.2d 323 (2d Cir. 1986) (injunction granted against Board of

Elections determination that college dorm could not constitute "residence" for voter registration

purposes); *Pitts v. Black,* 608 F. Supp. 696 (SDNY 1984) (injunction against refusal to register

homeless voters); *Vanasco v. Schwartz,* 401 F. Supp. 87 (SDNY 1975), *aff'd,* 1976 U.S. LEXIS 921

(1976) (enjoining Board of Elections rules which censored content of campaign materials); *Credico v. New York State Bd. of Elections,* 751 F. Supp. 2d 417 (EDNY 2010) ("Because violations of First Amendment rights are commonly considered irreparable injuries, I have no trouble concluding that plaintiffs have established that, in the event the injunction is not granted, they will suffer an irreparable injury") (cleaned up).

## CONCLUSION

For the reasons above, Plaintiffs ask the Court to grant their motion for injunctive relief, as set out in the Notice of Motion.

Respectfully submitted,

/s/

J. Remy Green
COHEN&GREEN P.L.L.C.
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

Angel Cruz, Esq.
909 Sheridan Ave., Suite #4
Bronx, New York 10451
acruzesq@gmail.com

### ADDENDUM:  Local Law No. 15 Eligible Offenses Among NYC Politicians

**Total:**                        24
**White:**                        6
**Black & Latino:**               18

1.  **Angel Rodriguez**                    **Latino**
City Council, Brooklyn

2.  **William F. Boyland Jr.**             **Black**
Assemblyman, Brooklyn

3.  **Nelson L. Castro**                   **Latino**
Assemblyman, Bronx

4.  **Miguel Martinez**                    **Latino**
City Council, Manhattan

5.  **Pedro Espada Jr.**                   **Latino**
Senator, Bronx

6.  **Efraín González Jr.**               **Latino**
Senator, Bronx

7.  **Diane M. Gordon**                    **Black**
Assemblywoman, Brooklyn

8.  **Alan G. Hevesi**                     **White**
Comptroller

9.  **Shirley L. Huntley**                 **Black**
Senator, Queens

10. **Carl Kruger**                        **White**
Senator, Brooklyn

11. **Brian M. McLaughlin**                **White**
Assemblyman, Queens

12. **Hiram Monserrate**                   **Latino**
Senator, Queens

13. **Clarence Norman Jr.**                **Black**
Assemblyman, Brooklyn

14. **Kevin S. Parker**                    **Black**
Senator, Brooklyn

**15. Gabriela Rosa**                    **Latino**
Assemblywoman, Manhattan

**16. John L. Sampson**                  **Black**
Senator, Brooklyn

**17. William Scarborough**              **Black**
Assemblyman, Queens

**18. Anthony S. Seminerio**             **White**
Assemblyman, Queens

**19. Sheldon Silver**                   **White**
Assembly Speaker

**20. Malcolm A. Smith**                 **Black**
Senator, Queens

**21. Ruben Wills**                      **Black**
City Council, Queens

**22. Dan Halloran**                     **White**
City Council, Queens

**23. Larry Seabrook**                   **Black**
City Council, Bronx

**24. Eric A. Stevenson**                **Black**
Assemblyman, Bronx

Sources on Convictions:
https://www.nytimes.com/interactive/2014/07/23/nyregion/23moreland-commission-and-new-york-political-scandals.html
https://apnews.com/article/a385a10afd1143d88d96fceffb687f70
https://en.wikipedia.org/wiki/List_of_American_state_and_local_politicians_convicted_of_crimes
https://www.nytimes.com/2009/12/16/nyregion/16martinez.html
https://www.nydailynews.com/news/disgraced-ex-pol-invisible-article-1.240437