| | |
|---|---|
| UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK <br><br> Malikah Shabazz, Sonya Harvey, Rosa Sanchez, and Frank Taylor, *individually, and on behalf of all others similarly situated*, <br><br>           *Plaintiffs*, <br><br>   v. <br><br> New York City Campaign Finance Board, Amy M. Loprest, *solely in her official capacity, as the Executive Director of the New York City Campaign Finance Board*, Hillary Weisman, *solely in her official capacity as the General Counsel of the New York City Campaign Finance Board,* and the City of New York. <br><br>           *Defendants*. | Docket No. 21-cv-3069 |

## PLAINTIFFS' REPLY MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

J. Remy Green
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
remy@femmelaw.com


*Attorneys for Plaintiffs*

April 21, 2021

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................................ii

PRELIMINARY STATEMENT.....................................................................................................1

FACTUAL RESPONSE .................................................................................................................2

ARGUMENT...................................................................................................................................3

    I.    Defendants Waive Opposition to Critical Points and Make No Serious Argument the Election Cycle Had Not Begun............................................................................................3

    II.    Plaintiffs Have Standing Because the Purpose of the Campaign Finance Law is to Amplify the Voices of People Like Plaintiffs. ........................................................................5

    III.    *Rivera-Powell* Quasi-Abstention is Not Appropriate. ...................................................7

        A.    *Rivera-Powell* does not apply here..............................................................................7

        B.    *Rivera-Powell* is no longer good law, or is at the least cabined to its facts..............9

    IV.    Laches Does Not Apply.................................................................................................10

    V.    No Rule 65(c) Security is Warranted Here. ..................................................................12

CONCLUSION.............................................................................................................................14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
   880 F. Supp. 2d 456 (S.D.N.Y. 2012), appeal dismissed, No. 12-3174 (2d Cir.
   Sept. 25, 2012) ..................................................................................................................1

*Bass v Richardson*,
   338 F Supp 478 (SDNY 1971) ................................................................................... 12, 13

*Bob Jones Univ. v United States*,
   461 US 574 (1983) .........................................................................................................4, 7

*Common Cause Ind. v. Lawson*,
   2020 U.S. Dist. LEXIS 179161 (S.D. Ind. 2020) .............................................................12

*Common Cause R.I. v. Gorbea*,
   970 F.3d 11 (1st Cir. 2020), *stay denied* 207 L. Ed. 2d 1154 (2020) ...............................11

*Democratic Nat'l Comm. v. Bostelmann*,
   Nos. 20-2835, 20-2844, 2020 U.S. App. LEXIS 31950 (7th Cir. Oct. 8, 2020)
   (Rovner, J., dissenting) .....................................................................................................11

*Doe v Perales*,
   782 F Supp 201 (WDNY 1991) .......................................................................................13

*EH Fusion Party v Suffolk County Bd. of Elections*,
   401 F Supp 3d 376 (EDNY 2019) .....................................................................................9

*Exxon Mobil v. Saudi Basic Indus.*,
   544 U.S. 280 (2005) ......................................................................................................9, 10

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
   218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y.2002) ......................................................3

*Gallagher v. N.Y. State Bd. of Elections*,
   2020 U.S. Dist. LEXIS 138219 (SDNY Aug. 3, 2020) ......................................................3

*Gallagher v NY State Bd. of Elections*,
   477 F Supp 3d 19 (SDNY 2020) ....................................................................................5, 6

*Good News Club v. Milford Cent. Sch.*,
   533 U.S. 98 (2001) .............................................................................................................1

*Govt. Emples. Ins. Co. v Wellmart RX, Inc.*,
   435 F Supp 3d 443 (EDNY 2020) ...................................................................................13

*Hartford Courant Co., LLC v Carroll*,
    474 F Supp 3d 483 (D Conn 2020) ............................................................................... 13

*Jones v United States Postal Serv.*,
    488 F Supp 3d 103 (SDNY 2020) ................................................................................... 5

*Kaloshi v. New York City Board of Elections*,
    2002 US Dist LEXIS 17803 (EDNY Sep. 6, 2002), *rev'd on fact grounds in Kaloshi v
    Spitzer*, 69 F App'x 17 (2d Cir. 2003) .......................................................................... 5

*Libertarian Party of Connecticut v. Merrill*,
    2016 U.S. Dist. LEXIS 194740 (D. Conn. Jan. 26, 2016) ................................................ 13

*Lopez v Delta Funding Corp.*,
    1998 US Dist LEXIS 23318 (EDNY Dec. 23, 1998) ......................................................... 13

*Moccio v. N.Y. State Office of Court Admin.*,
    95 F.3d 195 (2d Cir. 1996) ............................................................................................. 9

*NAACP v. E. Ramapo Cent. Sch. Dist.*,
    2020 U.S. Dist. LEXIS 95300 (SDNY 2020) .................................................................. 11

*New York v Trump*,
    485 F Supp 3d 422 (SDNY 2020) ................................................................................ 6, 7

*New York v. U.S. Dep't of Homeland Sec.*,
    969 F.3d 42 (2d Cir. 2020) ............................................................................................. 7

*NY Progress & Protection PAC v Walsh*,
    733 F3d 483 (2d Cir. 2013) ........................................................................................... 13

*P.F. v E. Hartford Bd. of Educ.*,
    2008 US Dist LEXIS 133239 (D Conn Nov. 19, 2008) .................................................. 13

*Pharm. Socy. v NY State Dept. of Social Servs.*,
    50 F3d 1168 (2d Cir. 1995) ........................................................................................... 13

*Pleasant Grove City, UT v. Summum*,
    555 U.S. 460 (2009) ........................................................................................................ 1

*Poindexter v Strach*,
    324 F Supp 3d 625 (EDNC 2018) ......................................................................... 3, 4, 10

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) .......................................................................................... 1, 10, 11, 12

*Rivera v Town of Huntington Hous. Auth.*,
    2012 US Dist LEXIS 74267 (EDNY May 29, 2012) ........................................................ 13

*Rivera-Powell v NY City Bd. of Elections*,
    470 F3d 458 (2d Cir. 2006) ................................................................................... 7, 8, 9, 10

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ........................................................................................................... 1

*Self Advocacy Sol. N.D. v. Jaeger*,
    2020 U.S. Dist. LEXIS 97085 (D.N.D. 2020) ............................................................. 12

*Sprint Communs., Inc. v Jacobs*,
    571 US 69 (2013) ......................................................................................................... 9, 10

*Trump v New York*,
    ___US___, 141 S Ct 530 (2020) ..................................................................................... 6

*U.S. Student Ass'n Fdn. v. Land*,
    546 F.3d 373 (6th Cir. 2008) ......................................................................................... 12

*Vanderkodde v Mary Jane M. Elliott, P.C.*,
    951 F3d 397 (6th Cir. 2020) (Sutton, J., concurring) .............................................. 9, 10

*Yang v Kellner*,
    458 F Supp 3d 199 (SDNY 2020) ................................................................................... 8

*Yang v. Kosinski*,
    960 F3d 119 (2d Cir. 2020) ......................................................................................... 4, 8

**Statutes**

Elec. L. § 2-120 .......................................................................................................................... 4

Elec L. § 4-106 ........................................................................................................................... 4

Elec. L. § 6-104(6) ..................................................................................................................... 4

**Other Authorities**

First Amendment ............................................................................................................ *passim*

"Benefits," NEW YORK CITY CAMPAIGN FINANCE BOARD (accessed Apr. 21, 2021),
    available at https://www.nyccfb.info/program/benefits. ............................................ 1

Campaign Finance Handbook, 2021 Election Cycle (Version 3), NEW YORK CITY
    CAMPAIGN FINANCE BOARD, at 69 (Jan. 2021) .......................................................... 2

"Campaign Finance Resources," NEW YORK CITY CAMPAIGN FINANCE BOARD
    (accessed Apr. 21, 2021), available at
    https://www.nyccfb.info/program/campaign-finance-resources/. ........................ 5

Fed. R. Civ. P. 65(c) ........................................................................................................ 12, 13

"Impact of Public Funds," NEW YORK CITY CAMPAIGN FINANCE BOARD (accessed
    Apr. 21, 2021), available at https://www.nyccfb.info/program/impact-of-public-
    funds .................................................................................................................................1

Samuel Bray, *Rooker-Feldman (1923-2006)*, 9 Green Bag 2d 317, 317-18 (2006) ......................9

Susan Bandes, *The Rooker-Feldman Doctrine: Evaluating Its Jurisdictional Status*, 74 Notre
    Dame L. Rev. 1175, 1175 (1999) ..............................................................................9

**PRELIMINARY STATEMENT**

Defendants' opposition (ECF 22, "DMOL") hinges almost entirely on two key assumptions: (1) an election cycle doesn't begin in New York until petitioning for ballot access starts and (2) the intention of New York's matching fund's program is not to amplify the voices of voters, but to ensure campaigns have more total money. Each of these assumptions is faulty.

First, Defendants themselves disbursed funds for this campaign long before petitioning started. And they do not address the many ways campaigns had long been underway when Local Law 15 was passed: endorsements, advertising, debates, and so on. Indeed, by invoking *Purcell*, Defendants logically concede as much. The idea that a candidate should just wake up and decide to run the first day of petitioning is not based in reality. Second, targets of the matching funds program, in Defendants' own words, are the "voices of ordinary voters."[1] That is, "the Program ensures that voters, not money, have the final say in New York City government."[2] Just as with the first assumption, the idea that voters have no important First Amendment right to have their voices amplified — as the government has already promised — is not based in reality.[3]

Without these assumptions, and for the reasons discussed below, Defendants' opposition fails, and the motion should be granted.

---

[1] "Benefits," NEW YORK CITY CAMPAIGN FINANCE BOARD (accessed Apr. 21, 2021), available at https://www.nyccfb.info/program/benefits.

[2] "Impact of Public Funds," NEW YORK CITY CAMPAIGN FINANCE BOARD (accessed Apr. 21, 2021), available at https://www.nyccfb.info/program/impact-of-public-funds.

[3] While the sliding scale *Anderson-Burdick* test is appropriate here, because this is an election-related restriction, if Defendants are right that Plaintiffs' rights are not appropriately considered in the election context, analysis shifts to the more conventional First Amendment public forum inquiry. That is, in the CFB program, the government has offered a forum for speech. And if the government opens a traditional or designated public forum, restrictions must pass strict scrutiny. *Pleasant Grove City, UT v. Summum*, 555 U.S. 460, 469 (2009); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 469 (S.D.N.Y. 2012), appeal dismissed, No. 12-3174 (2d Cir. Sept. 25, 2012). If, on the other hand, the government has opened a limited public forum, restrictions must be viewpoint-neutral. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). And, in essence, this analysis is not profoundly different from the *Anderson-Burdick* inquiry. Rather, it similarly looks to the right at stake to determine how closely to look at the restriction, and then applies an appropriate level of scrutiny. And Local Law 15, as applied this cycle, cannot survive any level of scrutiny.

**FACTUAL RESPONSE**

As Plaintiffs noted in the opening brief, there is very little (if anything) in dispute in this case. Defendants largely seem to agree. That said, Defendants' characterization of facts on two fronts does not pass muster.

First, Defendants' *memo* suggests that Monserrate "had not qualified to receive matching funds when LL15 was enacted." DMOL at 13. Not so. As Danielle Willemin, the Director of Auditing and Accounting at the CFB explains, "[o]n February 22, 2021, Monserrate's campaign submitted amendments to its January 15 filing. Based on CFB staff's review of those amendments, the campaign met the threshold and, but for Monserrate's legal ineligibility to appear on the ballot, would have been eligible to receive a payment." ECF 20 ¶ 13. Willemin explains the payment would have been "on March 15 in the amount of $41,838." But the question of entitlement to funds is clear: "on February 22, 2021," Monserrate had filed everything needed to qualify for matching funds. *Id.* And, "but for" the enactment of Local Law 15 on February 23 — that is, *after* Monserrate qualified — he would have received those funds. Put differently, Defendants' witness concedes that after Monserrate *qualified*, but before disbursement, the law changed. But, of course, if the law had been changed after *disbursement*, this case wouldn't exist: matching funds would have been disbursed.

Additionally, Defendants' argument might be read to suggest something was unusual about Monserrate submitting "amendments" to his filings. If this is Defendants' argument, it is misguided. There is a routine amendment, error, and omission process that many candidates engage in. *See,* Campaign Finance Handbook, 2021 Election Cycle (Version 3), NEW YORK CITY CAMPAIGN FINANCE BOARD, at 69 (Jan. 2021) ("Handbook").[4]

---

[4] *Available at* http://www.nyccfb.info/PDF/candidate_services/Handbook_2021.pdf.

2

## ARGUMENT

I. **Defendants Waive Opposition to Critical Points and Make No Serious Argument the Election Cycle Had Not Begun.**

Defendants fail to oppose several important arguments and facts. Such failure to address facts or arguments concedes them. Gallagher v. N.Y. State Bd. of Elections, 2020 U.S. Dist. LEXIS 138219, at *63 n.4 (SDNY Aug. 3, 2020) (defendants "do not cite—much less distinguish—" a case, which amounts to a "concession of the case's applicability."), *citing In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 U.S. Dist. LEXIS 141449, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (a party "concedes through silence" to arguments by its opponent that it fails to address) *and First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y.2002) (considering an argument not addressed in opposition brief to be waived).

Defendants present no serious argument that the campaign was not underway when Local Law 15 was passed. True, they argue that "plaintiffs fail to recognize and acknowledge that Monserrate had not qualified for placement on the ballot when LL15 was enacted." DMOL at 12. But no case defines "during an election cycle" (*Poindexter v Strach*, 324 F Supp 3d 625, 632 (EDNC 2018)) to mean "after the ballot is finalized." And Defendants make no comment about the many signs the election cycle was long underway: the endorsements beginning in December 2020 (ECF 5 at 2), the campaigns running since last year (*id.*), and — as Defendants themselves acknowledge — the CFB disbursing funds for *this election* on "December 15, 2020 and January 15, February 16, March 15, [2021]," all before petitioning closed in late March. Thus, beyond their suggestion that an election cycle is not underway until ballot access petitioning closes, Defendants make no argument.

The CFB's own Handbook states: "the 2021 election cycle … began on January 13, 2018, and runs through January 14, 2022." Handbook at vi. They even provide a definition: an "election cycle" "begins on the first date you can register your committee for the upcoming election and ends in January of the year following the election." *Id.* So, using Defendants' own definition, the election

3

cycle was *long* underway by February 23, 2021.  But perhaps Defendants' (non-litigation) definition of "election cycle" is a little long (at least for applying *Poindexter* and *Yang*).  Looking to the Election Law itself, the certification of the offices on the ballot by the State and City Boards of Election is due by February 1.  Elec L. § 4-106.  That seems a fair place to mark the start of the election cycle: when the offices on the ballot are officially announced.  Beyond that, parties must file a statement of the party positions to be filled by February 16.  Elec. L. § 2-120.  Outside the primary process, committee meetings to nominate candidates for statewide office must take place between February 9 and March 2.  Elec. L. § 6-104(6).  In all events, the Election Law suggests that the election cycle was underway, at the latest, in early February.

Perhaps most importantly, Defendants never dispute that, as a practical matter, by the time Local Law 15 became law on February 23, it was far too late for any new candidate to join the fray.  Compl. ¶ 35; PMOL at 7 ("it was *far* too late for a new candidate to step into Monserrate's shoes to represent his constituency") (emphasis in original).  *See also,* Note 11, below.  But no matter when the cycle began, Defendants' suggestion that February 23 was not "during [this] election cycle" is, in short, unserious.  And they have waived the opportunity to make a serious argument.

Finally, Defendants concede, by failing to address it at all, that Local Law 15 has concerning racial implications — which "call[] for heightened scrutiny."  PMOL at 10; 18-19; *unaddressed in* DMOL *except arguably at* 14.  And of course, the racial disparity in the people who would, historically, have been excluded from the ballot by Local Law 15 implicates Plaintiffs' right of association.  *See, e.g., Bob Jones Univ. v United States*, 461 US 574, 605 (1983); *see also, Yang v. Kosinski*, 960 F3d 119, 129 (2d Cir. 2020) (under *Anderson-Burdick*, to receive less than strict scrutiny, a restriction must be both "reasonable" and "*nondiscriminatory.*") (emphasis added).  As explained in the opening brief, it appears that of the 24 historical politicians in New York City who have been convicted of Local Law 15 offenses, 18 are Black or Latino — a full 75%.  That is wildly out of proportion, and means that the

4

measure gets strict scrutiny under *Anderson-Burdick* (or, alternatively, under the Equal Protection clause proper).

## II. Plaintiffs Have Standing Because the Purpose of the Campaign Finance Law is to Amplify the Voices of People Like Plaintiffs.

Defendants seemingly argue that voters lack standing, in all cases, independent of candidates. DMOL at 8-9. That argument ignores the vast weight of authority. Voter standing doctrine is robust and well-settled. Sometimes voters have more robust standing that candidates. *See, e.g., Gallagher v NY State Bd. of Elections*, 477 F Supp 3d 19, 35 (SDNY 2020). *See also, Jones v United States Postal Serv.*, 488 F Supp 3d 103 (SDNY 2020) (relying on voter standing, even in the presence of candidate-plaintiffs); *Kaloshi v. New York City Board of Elections*, 2002 US Dist LEXIS 17803, at *18 (EDNY Sep. 6, 2002) ("voter Plaintiffs also have third party standing to challenge the witness party enrollment requirement"), *rev'd on fact grounds in Kaloshi v Spitzer*, 69 F App'x 17, 19 (2d Cir. 2003) (voters lacked standing because, even if the challenged law were invalid, candidate still "did not qualify for the ballot," and thus no injury). Of course, standing depends on the injury asserted.

Defendants argument that voter-donors don't have standing because a campaign does is misguided in several ways (DMOL at 8, "Hiram 21, not [Plaintiffs], suffered the injury of not receiving matching funds").

First, it requires the Court to assume that the intended beneficiary of the Campaign Finance Law is campaigns. That is, Defendants tacitly argue that the intent of the legislature was to just increase the raw amount of money in City politics. That notion is betrayed by the sheer volume of statements on Defendants' website that people like Plaintiffs are *exactly* who the Campaign Finance Law was intended to benefit. *See,* Notes 1 & 2, above. *See also*, "Campaign Finance Resources," NEW YORK CITY CAMPAIGN FINANCE BOARD (accessed Apr. 21, 2021) ("The Program is designed to encourage New Yorkers to participate in their city elections" and "The CFB's mission is to

increase voter engagement and participation [and] enhance the role of small contributors in funding campaigns").[5]

Moreover, the latent argument that, in essence, "if the campaign has standing, voters don't," is wrong. Is it is common that *multiple* parties — including both candidates and voters — have standing to enforce the same rights. *See, e.g.*, *Gallagher v NY State Bd. of Elections*, 477 F Supp 3d 19, 35 (SDNY 2020) ("Because [voter Plaintiffs] and the candidate Plaintiffs seek the same relief, therefore, the candidates need not have standing in their own right. [But, i]n any event, all four candidates allege cognizable injuries in fact."). There is nothing in standing doctrine that suggests that the same wrong can't cause multiple injuries. While, of course, the campaign has suffered *some* injury, so have the voter-Plaintiffs: their donations were not matched. Indeed, the entire premise of the Campaign Finance system depends on that injury. The system is designed to "empower[] New Yorkers in every neighborhood to make their voices heard in city elections." "Benefits," *supra*. And as Defendants explain, the "success of New York City's Campaign Finance Program demonstrates how small-dollar matching funds can engage citizens and strengthen democracy." *Id*. And because the CFB's application of Local Law 15 has made Plaintiffs' voices quieter than others — exactly one ninth the volume — they have suffered an "injury in fact."

Defendants argument on traceability is simply wrong. While Defendants argue that there must be a "causal connection," "[i]mportantly, proximate causation is *not* a requirement of Article III standing, which requires only that the plaintiff's injury be *fairly traceable* to the defendant's conduct." *New York v Trump*, 485 F Supp 3d 422, 445 (SDNY 2020) (alterations adopted, emphasis in *Trump*), quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).[6] And, as the

---

[5] *Available at* https://www.nyccfb.info/program/campaign-finance-resources/.
[6] *Trump* was reversed on injury (e.g., "substantial risk" of harm analysis) — as well as ripeness and feasibility — - grounds in *Trump v New York*, ___US___ , ___, 141 S Ct 530, 535 (2020). But the three judge panel's analysis of the other prongs of standing remains sound.

6

three judge panel in *Trump* explained, "for an injury to be 'fairly traceable' to a defendant's conduct, that conduct need not be 'the very last step in the chain of causation.'" *Id.* at 446, *quoting Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).  And Defendants cannot on one hand claim that matching funds are a wonderful thing because they incentivize ordinary New Yorkers to donate to political campaigns, and on the other claim that it is impossible to trace donations to that incentive.  The Second Circuit has called similar arguments "disingenuous." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 60 (2d Cir. 2020).  *See also, Jones,* 488 F. Supp. 3d (same).

Even if it were right to say that Plaintiffs did not donate because they were incentivized to do so (*see contra,* Shabazz Dec. ¶ 3; Harvey Dec. ¶ 3; Sanchez Dec. ¶ 3; Taylor Dec. ¶ 3), that does not mean that failing to match their donation works no traceable injury.  As Defendants concede, "but for" Local Law 15, Plaintiffs' — and the class's — donations would be matched.  ECF 20 ¶ 13.  That is a concession of causation, injury, and traceability all in one.  And so, Plaintiffs have standing.

### III. *Rivera-Powell* Quasi-Abstention is Not Appropriate.

#### A. *Rivera-Powell* does not apply here.

Defendants' arguments on *Rivera-Powell* stretch the case beyond any recognition.  *Rivera-Powell* has little to do with the difference between as-applied and facial challenges. Rather, it turns on the fact that any misapplication of a state election law has Due Process implication.  But the basic idea that Federal Courts should not be "thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency" (*Rivera-Powell v NY City Bd. of Elections*, 470 F3d 458, 469 (2d Cir. 2006) (*quoting Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970))) does not mean this Court lacks jurisdiction to determine whether Local Law 15 — on its face or in its sole application — is constitutional.  That is, *Rivera-Powell* only applies when there is an "admittedly valid restriction"

7

on which a plaintiff asserts that mistakes amount to a due process violation.  It has little, if anything, to do with pure First Amendment claims like those presented here.

Indeed, courts decide "as applied" (DMOL at 14) challenges to election restrictions constantly.  *See, e.g.*, *Yang v Kellner*, 458 F Supp 3d 199 (SDNY 2020).[7]  Defendants' argument that somehow *Rivera-Powell* bars *all* "as applied" First Amendment challenges cites no cases because no cases exist.

Finally, as Defendants note, *Rivera-Powell* depends on the existence of a state court remedy.  DMOL at 2-3.  But Defendants have argued in State Court that "claims [under Section 1983] are not properly brought as part of an Article 16 Proceeding."  *Monserrate v. Commissioners of Board of Elections in the City of New York*, 708837/2021, Doc. No. 8 at 2.[8]  And perhaps more to the point, Plaintiffs here lack any standing to bring Election Law proceedings — but as explained above, they do have their own, free-standing First Amendment interests in seeing their contributions matched.  So, unlike *Rivera-Powell* itself, Defendants have affirmatively argued that the relief sought here is *unavailable* in the state forum.  And there is little question that Plaintiffs themselves lack standing in state Election Law proceedings.[9]  Thus, *Rivera-Powell* does not apply on its face:  Plaintiffs have no right to assert *any* claims in a state Election Law proceeding.

---

[7] *Yang* rejected an identical *Rivera-Powell* argument to the one made here without comment.  *See Yang*, Dkt. 33 at 9-10 (as paginated).

[8] *Available at* https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=suEzoWXNo/PFQ5iNvwaeRA==.

[9] Defendants suggest *Rivera-Powell* rejected what Defendants characterize as "sham" proceedings — where a candidate and their supporters both sue.  Putting aside that this is the form that virtually every constitutional election proceeding takes, Defendants' reading of *Rivera-Powell* stretches the text too far.  All the decision says is that Rivera-Powell's supporters "alleged no deprivation independent of Rivera-Powell's."  470 F3d at 468.  Thus, the Court didn't need to analyze the questions separately.  This is just routine logic:  Courts (rightly) don't always repeat themselves when the same analysis answers multiple questions.  Defendants cite no case applying the kind of "sham" analysis they invite the Court to apply.  And more to the point, as explained above, the rights Plaintiffs assert here are free-standing and vital.

B.        *Rivera-Powell* is no longer good law, or is at the least cabined to its facts.

*Rivera-Powell*, as Defendants seek to apply it, is essentially a kind of abstention. That is, just as in the various abstention doctrines, it turns on questions of comity and efficiency between state and federal sovereigns. Defendants are not arguing there is no First Amendment question to resolve — they are arguing that the Court should sit back and allow the state court to act. So, as would be the case with *Colorado River* abstention, for example, Defendants' *Rivera-Powell* argument turns on the existence of parallel proceedings, and the question of which court should handle the various state and federal proceedings presented. But these days, for election cases, the answer is simple: both. *EH Fusion Party v Suffolk County Bd. of Elections*, 401 F Supp 3d 376, 387 (EDNY 2019).

Put differently, there is no question that the Court has jurisdiction to decide whether Plaintiffs have been deprived of their First Amendment rights, and "[j]urisdiction existing … a federal court's obligation to hear and decide a case is virtually unflagging." *Sprint Communs., Inc. v Jacobs*, 571 US 69, 78 (2013). Historically, when *Rivera-Powell* was decided, abstention was just ending its days as a favored doctrine. *See, e.g.*, *Vanderkodde v Mary Jane M. Elliott, P.C.*, 951 F3d 397, 405 (6th Cir. 2020) (Sutton, J., concurring), *citing* Samuel Bray, *Rooker-Feldman (1923-2006)*, 9 Green Bag 2d 317, 317-18 (2006). *See also*, Susan Bandes, *The Rooker-Feldman Doctrine: Evaluating Its Jurisdictional Status*, 74 Notre Dame L. Rev. 1175, 1175 (1999); *Moccio v. N.Y. State Office of Court Admin.*, 95 F.3d 195, 199 (2d Cir. 1996). The heyday of abstention began its close with *Exxon Mobil v. Saudi Basic Indus.*, 544 U.S. 280 (2005). But that decision did not stop abstention doctrines from getting "back to [their] old tricks of interfering with efforts to vindicate federal rights and misleading federal courts into thinking they have no jurisdiction over cases Congress empowered them to decide." *Vanderkodde*, 951 F3d at 405. So the Supreme Court issued more guidance on the point, emphasizing that its "dominant instruction" is that "[j]urisdiction existing … a federal court's obligation to hear and decide a case is virtually unflagging." *Sprint*, 571 US at 78. In other words,

9

when it comes to abstention, as Judge Sutton put it, absent circumstances clearly identified in a Supreme Court opinion, "[t]he court should exercise jurisdiction anyway and ask the U.S. Supreme Court to reverse it.  The Court, I suspect, never will, and that's all we lower court judges should need to know."  *Vanderkodde,* 951 F3d at 409.

Thus, when a party (like Defendants here) asks the Court to hold back an exercise of jurisdiction in the name of comity, efficiency, or some other value — as *Rivera-Powell*'s quasi-abstention analysis calls for[10] — the Court should be mindful of the "dominant instruction" that the "obligation to hear and decide a case [where there is jurisdiction] is virtually unflagging."  *Sprint*, 571 US at 78.  In other words, Courts should let abstention reach exactly those the circumstances identified by the Supreme Court and "no further."  *Id.* at 82.  The quasi-abstention application of *Rivera-Powell* Defendants urge, if it was ever proper, does not survive *Exxon* and *Sprint*.  And this case presents profoundly different facts than *Rivera-Powell*.  So, even if it remains good law, the change in how the Supreme Court treats abstention-like doctrines suggests the Court should not stretch *Rivera-Powell* past those facts.

## IV.     Laches Does Not Apply.

Defendants' laches argument has little to do with the rights asserted here.  Though Defendants' argument begins with February 16 (DMOL at 17), as they acknowledge, as of February 22, Monserrate had corrected errors and "but for" a law enacted a day later on February 23, would have received funds.  ECF 20 ¶ 13.  Nor would a suit regarding Local Law 15 make sense before it was a law — indeed, Defendants' laches point here really shows the mid-cycle effect of Local Law 15.[11]  And as Defendants concede, there are still three more dates on which they will issue matching

---

[10] As explained above, the better reading of *Rivera-Powell* — that would prevent its use here — is probably that *Rivera-Powell* only really applies to pure Due Process claims:  claims that turn on deprivation of a right without process.  And Plaintiffs have not asserted such a claim.

[11] Put differently, if Plaintiffs sued *so* close to the election itself that laches and *Purcell* apply, then there is no serious question that the law enacted just over a month earlier was enacted "during an election cycle."  *Poindexter v Strach*, 324 F Supp 3d 625, 632 (EDNC 2018).  There must be *some* time in an election cycle that isn't in the *Purcell* window.

funds: May 13, May 27, and June 17, 2021. ECF 20 ¶ 7. Thus, this is unlike a case in which an injunction would require election officials to take novel or unusual steps: the sole remedy would be treating Monserrate's donors like every other donor, and Monserrate's campaign like any other. The month between the challenged action and the suit — relative to the time horizons at issue — is simply not the kind of delay that compels a finding of laches. And Defendants cite no case with a similar time span. All of their cases (DMOL at 16) concern cases brought somewhere between one and "several" weeks before an election. But this case was brought approximately 11 weeks before the election.

Defendants also stretch *Purcell* far beyond its breaking point. "In all of two sentences, *Purcell* articulated not a rule but a caution: take care with lastminute changes to a state's election rules, lest voters become confused and discouraged from voting." *Democratic Nat'l Comm. v. Bostelmann*, Nos. 20-2835, 20-2844, 2020 U.S. App. LEXIS 31950, at *15 (7th Cir. Oct. 8, 2020) (Rovner, J., dissenting) (*Bostelmann* concerned an order that very well could confuse voters: changing a requirement for witness signatures). Those sentences noted that "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).

But this case has nothing to do with voters going to the polls. The effects of a decision here may be visible to voters in the form of advertising, mailers, or calls, but nothing about the order sought could "result in voter confusion and consequent incentive to remain away from the polls." *Id.* And Defendants do not explain how it could — they simply invoke *Purcell* as a shibboleth. That is not enough. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020), *stay denied* 207 L. Ed. 2d 1154 (2020) ("Because of the unusual -- indeed in several instances unique -- characteristics of this case, the Purcell concerns that would normally support a stay are largely inapplicable, and arguably

11

militate against it"); *NAACP v. E. Ramapo Cent. Sch. Dist.*, 2020 U.S. Dist. LEXIS 95300, *6-7 (SDNY 2020) ("Here, there is no complication or confusion … There is no change of wording or election protocols; due dates and procedures for returning mail-in ballots are unchanged; no ballots need to be reprinted; no polling place personnel must be trained or retrained").[12]  Indeed, relief has been granted far closer to elections than this case, consistent with *Purcell*. *See, e.g.*, *U.S. Student Ass'n Fdn. v. Land*, 546 F.3d 373, 387-89 (6th Cir. 2008) (six days before election).  The election will be 61 days away on the date the Court hears oral arguments.  Defendants cite no case extending *Purcell* out even close to that far.  And maybe more to the point, the CFB will be dealing with the fallout of ordinary election petitioning litigation — including other candidates being knocked off or restored to the ballot — because all of this week has involved such litigation in state court.  There is no confusion, no burden, and no application of *Purcell* here.

## V.     No Rule 65(c) Security is Warranted Here.

Defendants ask for Rule 65(c) security.  But no such security is warranted here.[13]  As Defendants' own case explains, the "possib[ility]" that a "class plaintiffs must provide all or part of the security in an amount to be determined" is "improper."  *Bass v Richardson*, 338 F Supp 478, 490 (SDNY 1971), *cited in* DMOL at 19.  As explained the Court explained in *Bass*, "[i]t is clear to us that

---

[12] *See also, Common Cause Ind. v. Lawson*, 2020 U.S. Dist. LEXIS 179161, *62 (S.D. Ind. 2020) ("the primary concern addressed in *Purcell*, namely, that altering election rules or issuing conflicting court orders … can create voter confusion and lead to decreased turnout at the polls (or, in this case, a disincentive to vote by absentee ballot), is not implicated by the injunction requested here by Plaintiffs"); *Self Advocacy Sol. N.D. v. Jaeger*, 2020 U.S. Dist. LEXIS 97085, *32 (D.N.D. 2020) ("The concerns that troubled the Supreme Court in Purcell are not present in this instance. A voter filling out an absentee ballot will be entirely unaffected by an order enjoining the signature-matching requirement").

[13] Nor is the amount Defendants ask for appropriate. *Cf. Bass,* 338 F Supp at 490. The amount required by Rule 65(c) is "an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  First, while the ask for security to review filings, they acknowledge that they have already conducted review for all existing filings, and the Monserrate campaign would be entitled to $95,114.00 in matching funds. ECF 20 ¶¶ 13-14. Second, for all candidates, as long as a campaign *spends* funds, CFB would not recover them. And, under the Campaign Finance Act, the campaign would even have a right to spend them — post disqualification — to repay campaign liabilities. NYC CFA §3-709. The only circumstance — not at issue here — where a candidate must "pay to the board an amount equal to the total of public funds received" is when the candidate commits "fraudulent acts in order to obtain a place on the ballot" or fails to actively campaign.  NYC CFA §3-710. Even if Defendants have a right to recover funds *from the campaign*, nothing would stop them from seeking such recovery. To that end, while Defendants argue that Monserrate failed to "pay his fines relating to prior elections" (DMOL at 19), they show no efforts to collect those fines.

indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c). Poor persons are by hypothesis unable to furnish security as contemplated in rule 65(c), and the court should order no security in connection with this preliminary injunction." *Id* (cleaned up). Thus, "no bond [was] required." *Id.* at 491. So too here. Plaintiffs are exactly the sort of small-amount donors contemplated by the Campaign Finance Law. It would be perverse to require them to post a bond in amounts beyond what they can afford just to vitiate their rights under the Campaign Finance Law. *See also, Doe v Perales*, 782 F Supp 201, 206 (WDNY 1991); *Rivera v Town of Huntington Hous. Auth.*, 2012 US Dist LEXIS 74267, at \*21 (EDNY May 29, 2012); *Lopez v Delta Funding Corp.*, 1998 US Dist LEXIS 23318, at \*51 (EDNY Dec. 23, 1998).

  More broadly, the Second Circuit has enforced a broad exception to the "bond requirement" for "cases involving the enforcement of 'public interests.'" *Pharm. Socy. v NY State Dept. of Social Servs.*, 50 F3d 1168, 1174 (2d Cir. 1995) (specifically, "comprehensive federal health and welfare statutes" in that case). In determining whether the "exception" for "litigation … in the public interest" applies, "the nature of the rights being enforced, rather than the nature of the entity enforcing them, is the central consideration in determining whether the bond requirement should be waived under this exception." *Id.* at 1174-75. Courts have applied *Pharm. Socy.* to all manner of public interest litigation. *See, for examples, Hartford Courant Co., LLC v Carroll*, 474 F Supp 3d 483, 508 (D Conn 2020) ("access to court records and proceedings"); *Libertarian Party of Connecticut v. Merrill*, 2016 U.S. Dist. LEXIS 194740 at \*20 (D. Conn. Jan. 26, 2016) ("First Amendment rights under the Abridgment Clause"); *Govt. Emples. Ins. Co. v Wellmart RX, Inc.*, 435 F Supp 3d 443, 456 (EDNY 2020) ("New York's No-Fault insurance statutes"); *P.F. v E. Hartford Bd. of Educ.*, 2008 US Dist LEXIS 133239, at \*13 (D Conn Nov. 19, 2008) ("federal rights under the IDEA"). Since this action is to enforce First Amendment rights, and there is no question that "securing First Amendment

rights is in the public interest" (*NY Progress & Protection PAC v Walsh*, 733 F3d 483, 488 (2d Cir. 2013)), the public interest exception to Rule 65(c) applies.

## CONCLUSION

For the reasons above, Plaintiffs ask the Court to grant their motion for injunctive relief.

Respectfully submitted,

/s/
_____
J. Remy Green
**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, New York 11385
(929) 888.9480 (telephone)
(929) 888.9457 (facsimile)
remy@femmelaw.com

14